1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10   WILLIAM PETER NEW,                      Civil No.    09-cv-2609-JLS (POR)

11                              Petitioner,  **REPORT AND RECOMMENDATION
                                             DENYING PETITION FOR WRIT OF**
12                    v.                      **HABEAS CORPUS**

13   DOMINGO URIBE, JR., Warden, et al.,     **[Document No. 1]**

14                             Respondent.

15                          **I. INTRODUCTION**

16          On November 18, 2009, Petitioner William Peter New filed a Petition for Writ of Habeas

17   Corpus pursuant to 28 U.S.C. § 2254.  (Doc. 1.)  First, Petitioner contends he is entitled to federal

18   habeas relief because the prosecution's 32-year delay before charging him with murdering his first

19   wife, Somsri New ("Somsri") violated his federal due process rights.  *Id.* at 26-47.  Specifically, in

20   light of unavailable witnesses and missing evidence, Petitioner contends the trial court deprived him

21   of his right to due process by forcing him to defend against a 1973 murder charge 32 years after the

22   incident.  *Id.*  Second, Petitioner contends the trial court improperly denied his pretrial motion to

23   sever Count One, relating to the death of Phyllis New, from Count Two, relating to the death of

24   Somsri New.  *Id.* at 48-56.  Petitioner contends the evidence was not cross admissible.  *Id.*  Further,

25   Petitioner contends the court's ruling allowing he be tried for both murders at the same time

26   improperly allowed the "stronger" evidence that he murdered his third wife,  Phyllis New

27   ("Phyllis"), to "spill over" to the weaker case that he murdered his first wife, Somsri.  *Id.*

28   //

                                      - 1 -                          09cv2609-JLS (POR)

1    On March 15, 2010, Respondents filed an Answer.  (Doc. 8.)  Respondents contend the state

2    court's denial of Petitioner's pre-trial motion to dismiss Count 2 (the murder of Somsri) was not

3    contrary to federal law because Petitioner failed to show actual prejudice when balanced against the

4    justification for the delay.  *Id.* at 23-46.   Further, Respondent contends the state court's denial of

5    Petitioner's pre-trial motion to sever the two murder trials was not contrary to federal law because

6    evidence of the two charges were cross-admissible.  *Id.* at 46-55.

7    On May 4, 2010, Petitioner filed a Traverse.  (Doc. 11.)  With regard to pre-indictment

8    delay, Petitioner contends Respondents' argument that Petitioner did not suffer undue prejudice as a

9    result of the delay in charging him with Somsri's murder is unfounded.  *Id.* at 14-18.  Further,

10   Petitioner contends the fact that the police did not conduct an ongoing investigation of Somsri's

11   death is not a justification for a 32-year delay in bringing charges.  *Id.* at 18-19.  With regard to the

12   trial court's failure to sever the two murder charges, Petitioner contends there was substantial

13   unmitigated danger that evidence as to each murder would be used impermissibly as propensity

14   evidence by the jury in determining petitioner's guilt.  *Id.* at 21.  Moreover, Petitioner contends the

15   state courts unreasonably discounted the substantial dissimilarities between the two murders.  *Id.* at

16   21-23.  Finally, Petitioner asserts the trial court's failure to give the jury a limiting instruction or

17   guidance on how to properly consider the evidence further denied him his constitutional right to a

18   fundamentally fair trial.  *Id.* at 24-25.

19   In consideration of the pleadings, the record, and controlling law, for the reasons set forth

20   below, the Court hereby RECOMMENDS the Petition be **DENIED**.

21   **II. FACTUAL BACKGROUND**

22   This Court gives deference to state court findings of fact and presumes them to be correct;

23   Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28

24   U.S.C.A. § 2254(e)(1) (West 2006); *see also Park v. Raley*, 506 U.S. 20, 35-36 (1992) (holding

25   findings of historical fact, including inferences properly drawn from these facts, are entitled to

26   statutory presumption of correctness).  The following facts are taken from the California Court of

27   Appeal's opinion (Lodgment 11) denying Petitioner's direct appeal of his conviction:

28   *//*

### A.     Phyllis's death

Petitioner and Phyllis, Petitioner's third wife, had been married for approximately 14 years before Phyllis's death.[1] At just after 4:00 a.m. on October 15, 2004, San Diego County deputy sheriffs arrived at Petitioner's mobile home in Santee after having received a call about a burglary and a possible victim inside the home. Petitioner was standing outside the mobile home when deputies arrived. Deputies entered the home and found Phyllis lying in the bed, motionless, on her stomach. Her body was underneath the bed covers, which were pulled up to her neck. There was a raised red lump near the center of the back of her head, and blood from her nose and ear had soaked the pillow. Deputies noticed that the edges of the blood stain appeared to have started to dry, as if the blood had been there for a while. Phyllis had no pulse, and her neck was cold to the touch.

Paramedics who were called to the scene checked for postmortem lividity.[2] They noted blotchiness and a line that indicated lividity along the left side of Phyllis's back, her left hip/buttock area, and her left lower thigh area. There was mottling, which is indicative of lividity, on Phyllis's face and back. A paramedic checked Phyllis's jaw and found it somewhat stiff. Her jaw was not completely immovable, but it took "some force to try to move it." The paramedics concluded that Phyllis was beyond resuscitation. They believed that Phyllis had been dead for at least two hours. The paramedics declared Phyllis dead at 4:10 a.m.

Deputies testified that the bedroom in which Phyllis was found, appeared to have been slightly ransacked. Only the top drawers of the bedroom's dressers were open, and the contents of those drawers remained folded. It appeared that someone had lifted the drawers' contents and dropped them back into the drawers. The drawers of a large jewelry cabinet had been pulled out and were left stacked and leaning against the cabinet. Jewelry was scattered on the floor. A bedroom window was open and the screen was missing. No other rooms in the residence appeared to have been disturbed. According to one of the deputies, rooms that have been burglarized generally look much worse than the room in which Phyllis was found.

Deputies McEvoy and Turtzer examined the outside of the residence near the bedroom window. According to the deputies, the grass was wet and had not been disturbed. There were no detectible footprints on the concrete sidewalk under the window. An upside-down bucket under the window was covered in a fine layer of dirt that did not appear to have been disturbed. A fully intact screen was resting on top of a nearby garbage can. The windowsill of the open window was covered in a fine layer of dirt that did not appear to have been disturbed.[3]

Deputy McEvoy went back inside the residence and photographed the scene. Phyllis was still lying face down, but the blankets had been pulled down to her waist. The bed showed no sign of a struggle. As McEvoy attempted to retrieve Phyllis's identification from her purse, which was hanging from the doorknob on the inside of the bedroom door, he noticed that her purse contained a silver digital camera.

Lance Martini, a criminalist with the San Diego County Sheriff's crime lab, noticed a large amount of unburned gunpowder on the bedding and on the headboard near Phyllis. The bullet that killed Phyllis was .22-caliber. Martini was unable to find a manufacturer that produces .22-

---

[1] Petitioner corrects the record and indicates Petitioner and Phyllis were married for 20 years and were together for 25 years.  (Doc. 11 at 11.)

[2] "Postmortem lividity" or "livor mortis" was described at trial as "the discoloration of the skin due to pooling of the blood." (Lodgment No. 11 at 5.)

[3] Detectives who investigated the scene later noticed that there was no mud or dirt on the carpet between the open window and the bed. (Lodgment No. 11 at 5.)

1   caliber bullets that use the amount of cylindrical gunpowder found at the scene.

2   Deputy Sakamoto asked Petitioner what had happened. Petitioner told the deputy that
3   Phyllis had awakened him during the night complaining of a migraine. She asked Petitioner to go
    out to purchase some migraine medicine for her. Petitioner told Sakamoto that he drove to a 24-
4   hour drug store in El Cajon and purchased the medicine. Petitioner did not remember what time
    he had left to do the errand, but said that it took him approximately 30 minutes to return home.
5   When he arrived home, he found the front door of the mobile home wide open. Petitioner went
    inside and took the medicine into the kitchen before he went to the bedroom. When he went into
    the bedroom, he saw the open drawers. Petitioner then walked over to the bed, rolled Phyllis
6   over, and saw blood.[4]  Petitioner went to the kitchen to get a cordless telephone and called 911.

7   Petitioner sat in Sakamoto's patrol car until after the paramedics had left and Sakamoto
8   finished his shift. During that time, Petitioner appeared shocked and bewildered. He asked
    several times for information about whether the paramedics had taken his wife and how she was
    doing.

9

10  Detective Gardener saw a package of migraine medication, and a receipt for the medication,
    in the kitchen. The receipt showed that the medicine had been purchased at 3:49 a.m. on October
    15, 2004. The detective also saw a set of keys and a pair of Petitioner's sandals in the kitchen.

11

12  Petitioner was eventually taken to the police station for questioning. Petitioner's clothes
    were processed by evidence technicians. Petitioner did not ask about Phyllis during the three hour
13  interview. Further, Petitioner did not correct the investigators' misconception, based on
    information Petitioner had provided earlier, that his first wife had died in an automobile accident.[5]

14  San Diego County Deputy Medical Examiner Steven Campman was called to the scene to
15  examine Phyllis's body at approximately 5:00 p.m. on October 15. He noticed small black specks
    of gunpowder on the back of Phyllis's head and neck, and also on the bed and headboard near her.
16  By the time Campman examined Phyllis's body, there was a dried rivulet of blood emanating
    from the wound. Rigor mortis had set in her arms, legs, jaw and neck. Campman testified that
17  rigor mortis in the jaw usually begins between two to four hours after death. Campman testified
    that Phyllis's body also showed signs of livor mortis in that her blood had begun to pool and turn
18  a red color in parts of her body. According to Campman, lividity usually becomes visible and
    fixed in a body between eight to 12 hours after death.

19  Campman noticed that blood had run from Phyllis's mouth and nose onto the pillow below
20  her head. The blood on the pillow and sheets was dry around the edges and tacky in the center.
    Generally, blood has this consistency between 12 and 13 hours after death.

21  During the autopsy, Campman noticed stippling around the gunshot wound to Phyllis's right
22  occipital area. There was also a large amount of unburned gunpowder around the wound. The
    bullet had created a hole through the skull, traveled through the brain to the frontal lobes, and
23  lodged in Phyllis's left frontal lobe over her left eye socket. Based on the stippling around the
    wound, Campman opined that the bullet had been fired from an intermediate range, i.e., anywhere
    from an inch to two or three feet away.

24

25  Based on the degree of rigor mortis and lividity in Phyllis's body when he examined it at the
    scene, and on his observations during the autopsy, Campman concluded that Phyllis had died

26  _____

27  [4]A detective testified that Phyllis's body had not been turned over after she was shot.
    (Lodgment No. 11 at 6.)

28  [5]Petitioner's second wife eventually provided information regarding the actual
    circumstances of Somsri's death. (Lodgment No. 11 at 7.)

1    sometime prior to 3:00 a.m. on October 15, 2004.

2          Vincent DiMaio, Chief Medical Examiner for Bexar County, Texas, reviewed the reports of
     police officers and paramedics regarding their observations of Phyllis's body. Based on the
3    observations pertaining to the level of rigor mortis, body temperature, and livor mortis, DiMaio
     believed that the time of death was approximately two or three hours prior to the time paramedics
4    checked Phyllis at 4:10 a.m. DiMaio's interpretation of the stippling around the gunshot wound
     was that the bullet had been fired from within two inches of Phyllis's head. DiMaio surmised that
5    much of the unburned gunpowder around the wound was a result of the use of a .22-caliber bullet
     in a short barreled gun. DiMaio explained that a .22-caliber is meant to be fired from a gun with
6    a long barrel, such as a rifle. With a rifle, the gunpowder would be consumed in the long barrel.
     However, because the bullet had been fired from a shorter barreled weapon, the gunpowder was
7    not completely consumed.

8          A neighbor and coworker of Phyllis's, Carol Espinoza, testified that Phyllis had been
     worried about Petitioner not having a job. The night before Phyllis was killed, Phyllis had come
9    to Espinoza's home and told Espinoza that she had contacted the company where Petitioner was
     supposed to be working. She was told that Petitioner no longer worked there. Phyllis was upset.
10   She told Espinoza that she had told Petitioner what she had learned, and also told him that she
     was planning to follow him to work the next morning.

11

12         Phyllis had recently made similar complaints about Petitioner to others. Sometime within
     the six months before she was killed, she had told her friend, Richard Custin, that she was upset
13   because she and Petitioner were having financial difficulties. A friend of Petitioner and Phyllis's,
     Michael Hunter, also testified about the couple's financial difficulties. Four months before
14   Phyllis was killed, Petitioner told Hunter that he was not writing checks because there was no
     money in his account. Other witnesses similarly testified that there was financial strain in the
15   Petitioners' relationship.

16         Mary Goucher testified that she had been a friend of both Petitioner and Phyllis. Petitioner
     telephoned Goucher approximately twice a week after he was arrested for Phyllis's murder.
17   Petitioner also sent Goucher letters. During the telephone calls and in his letters, Petitioner told
     Goucher that he loved her. Goucher testified that she had never been intimate with Petitioner.

18         Anthi George testified that she had been a friend of Petitioner's when they were teenagers,
     but that they had lost touch for 40 years. In September 2004, George found Petitioner's name on
19   an internet site and sent him an email. George was living in Scottsdale, Arizona at the time.
     Petitioner eventually responded to George and the two began calling each other on the telephone.
20   George told Petitioner that she was divorced, and Petitioner told George that he was not married.
     A few weeks before October 14, 2004, Petitioner and George talked about Petitioner's intention to
21   travel to Phoenix to see his father. Petitioner made plans to meet George in Phoenix on October
     15. On October 16, Petitioner called George and told her that he was married and that his wife
22   had been murdered the previous night. George continued to communicate with Petitioner after
     Petitioner's arrest.

23

24         Los Angeles County Sheriff's Investigator Edward Huffman testified about an investigation
     in which he participated before he retired in 2000. The case involved Marc Jacobi, who was
25   Phyllis's son and Petitioner's stepson-to-be at the time. Jacobi had shot and killed a playmate with
     a rifle in Petitioner's home. Huffman saw four rifles, ammunition and holsters in the home.
26   Petitioner admitted to Huffman that he owned the guns and the ammunition.

27         Petitioner did not testify in his defense. Petitioner called Brian Burnett, an expert in
     gunshot residue analysis, to testify regarding his analysis of another criminalist's evaluation of
28   Petitioner's keys. Burnett opined that although the criminalist had found "lots of lead" on
     Petitioner's keys, this did not necessarily mean that there had been gunshot residue on Petitioner's
     keys. Burnett had done research on particles generally found on keys. He noted that gunshot

residue contains lead, antimony, and barium, and said that there would have been more particles of the other types of primer materials, along with the lead, if the substance on Petitioner's keys was gunshot residue. Burnett opined that the lead found on Petitioner's keys had come from the keys themselves, and not from gunshot residue. Burnett did not actually examine Petitioner's keys, or the evidence taken from them.

**B.     Somsri's Death**

At approximately 8:00 p.m. on September 9, 1973, San Bernardino Police officers and detectives were dispatched to Petitioner's residence in San Bernardino to investigate a shooting. Petitioner and a woman were standing outside the residence and met Officer Robert Martinez when he arrived. Martinez and Detective Gary Hilder thought that Petitioner appeared to be upset, nervous and distraught. When Martinez entered the residence, he saw Somsri lying on a love seat in the living room. He also noticed a rifle on the living room floor.

Martinez walked over to Somsri and touched her to determine whether she had a pulse. He did not detect a pulse. Martinez noticed a wound on the left top part of Somsri's head. Officers found several gun-related items on the coffee table, including rifle cleaning tools, ammunition, oil, and an operating manual for the rifle, opened to a page that contained a description of the proper way to load and unload a gun. The rifle was covered in oil from the barrel tip to the stock. Officers thought that this was unusual; normally, someone who is cleaning a gun would put a light coat of oil on only the metal parts, and would wipe off any excess because too much oil can cause a gun to jam. Three loose bullets on the coffee table were also covered with oil. A police officer opined that a person would generally never put oil on bullets when he or she was cleaning a gun. There was an open box of bullets on the table, from which five bullets were missing. Three were on the coffee table, one remained live in the rifle, and there was one expended cartridge casing in the kitchen. A detective thought it was unusual for a person to handle a firearm with live bullets in it while the firearm was oily. There were no cleaning rods in the vicinity of the rifle on the floor.

Officer Donald Saunders took photographs of the scene on the night of September 9, 1973. Saunders photographed the living room as Somsri lay on the love seat. He took photographs from the entry looking into the room, and from every corner of the room. He also took other photographs as directed by detectives. Saunders took photographs in both color and black and white.

Officer Nathan Rushing saw Somsri lying on the love seat, and saw a significant quantity of brain matter and blood on the east wall behind the love seat. The left side of Somsri's head above her ear, which was closest to the wall, was missing, for the most part. Officers saw an entrance wound on the right side of Somsri's head, behind her right ear.

After Somsri's body was removed, Rushing saw a substantial amount of blood in the corner of the love seat where Somsri's head had been. He noticed a bullet hole in the back cushion of the love seat. When the love seat was pulled away from the wall, Officer Rushing and Detective John Fields saw a hole in the back of the love seat and a hole in the wall behind the love seat. Fields believed that the hole in the back of the love seat was an exit hole because there were cotton fibers protruding from it. Rushing did not see any holes in the pillow on which Somsri's head had been lying, nor did he see any hole in the seat cushion of the love seat.

Detective Fields took measurements around the bullet hole in the wall. The hole was 19.5 inches above the floor and 58 inches from the northeast corner of the room.

Martinez spoke with Petitioner at the scene. Petitioner explained that he had been cleaning his rifle while sitting on the sofa in the living room. Somsri was asleep on the love seat. Petitioner told Martinez that while he was cleaning the rifle, he had put bullets into the gun. He said that he was taking the bullets out when the rifle slipped, fell to the ground, and discharged.

1   Petitioner told Martinez that he saw blood on Somsri's neck, and that he briefly attempted to
administer first aid. After he attempted to administer first aid, he immediately called for an
2   ambulance.

3       Officer Rushing saw and heard Petitioner telling someone how the rifle had accidentally
fired. He heard Petitioner say several times that he had been sitting on the sofa while cleaning his
4   rifle and running bullets through it when the gun slipped from his hands and discharged as he
reached for it. Petitioner demonstrated what he said had occurred. When Petitioner attempted to
5   pick up the rifle, Rushing told him to leave it on the ground. Based on Petitioner's demonstration
at the scene, Rushing estimated that the rifle had been between six and 12 inches off the ground
6   when it discharged.

7       Officer Art Yeakel took measurements of the room and made a diagram of the scene based
on those measurements. Yeakel noted the distances between various pieces of furniture and items
8   of evidence, including the gun, the sofa, the love seat, an expended cartridge near the refrigerator
in the adjoining kitchen, a pool of blood on the floor near the love seat, and a container with
9   knitting material in it. Yeakel did not measure the distance between the love seat and the wall.
Yeakel believed that his measurements were accurate to within one-half inch.

10
       According to Officer Rushing, detectives and officers did not call anyone to the scene to
11   perform blood splatter interpretations because that technology did not exist in 1973. At the time
of the incident, the officers and detectives who investigated the shooting believed that the
12   shooting was accidental.

13       Detective Hilder spoke with Petitioner at the police station later that night. Petitioner told
Hilder that he had just purchased the rifle, and said that he also owned two handguns. Petitioner
14   told Hilder that Somsri had been asleep on the love seat while Petitioner was "working the rifle's
action." The rifle slipped from his hands. When he caught it, it discharged in Somsri's direction,
15   and Petitioner immediately saw blood all over the wall. Petitioner demonstrated for Hilder what
had happened. Hilder opined from his recollection of Petitioner's demonstration that under
16   Petitioner's version of events, the rifle could not have been more than 20 inches off the ground
when it discharged. Petitioner told Hilder that he had been married to Somsri for three years and
17   that they had not been having any marital problems.

18       In 2005, San Diego County Sheriff's Department criminalist Gene Lawrence reviewed the
photographs and the police reports from the 1973 shooting to determine whether the evidence was
19   consistent with the statements Petitioner had made to police at the time. Lawrence drove to the
residence where the shooting occurred to take measurements around the windowsill near the love
20   seat where Somsri had been shot. The residence had "burned down" sometime between 1973 and
2005, but the "windowsill was still there."[6] Lawrence was able to measure the distance from the
21   floor to the windowsill. Using measurement ratios and evidence from the photographs, Lawrence
determined that the top of the seat cushion of the love seat had been approximately 17 inches
22   from the floor, and that the armrest had been about 20 inches from the floor. He concluded that
the top of the back of the love seat was approximately 32 inches from the floor.
23
       Using a live model who was the same height as Somsri, Lawrence had the model pose on a
24   mock-up love seat in the same position as Somsri's body appeared in the photographs of the
scene. He compared the position of the model with the position of a bullet hole in a wall 19.5
25   inches from the floor, behind the love seat. Lawrence opined that the height of the entrance
wound on Somsri's head as shown in the 1973 photographs was about 24 inches from the floor.
26   Based on this fact, Lawrence concluded that at the time Somsri was shot, she was not in the
position in which officers found her at the scene. He noted that the concentration of bloodstains
27

28       [6]Lawrence did not know whether the windows in the house had been removed, and could
not say definitively whether the windowsill was in exactly the same position it had been in 1973.

on the wall was higher than the level of Somsri's head in the 1973 photographs. He also noted that Somsri's hair on the left side of her head, against the love seat cushion, was pulled in an upward direction, which indicated that her head had moved downward along the cushion after she was shot.

Lawrence opined that the blood splatter on the wall was caused by the bullet entering Somsri's head, rather than exiting, because there was no brain matter mixed with the blood splatter. The blood and brain matter found on the love seat was caused by the bullet exiting Somsri's head. After considering all of this, Lawrence believed that Somsri's head was at least 30 inches above the floor at the time she was shot. He concluded that the physical evidence was not consistent with Petitioner's statements to police about how the shooting occurred.

Crime scene reconstructionist Robert Stites used computer enhancement tools to measure the distances and dimensions depicted in the photographs. He concluded that the height of the back of the love seat was 34 inches above the floor, and that the seat cushion of the love seat had been 19 inches above the floor. Based on his calculations, Stites determined that the bullet hole in the back of the love seat was 26 inches above the floor, and that the love seat had been 18 inches from the wall when Somsri was shot.

Rod Englert, another crime scene reconstructionist, believed that the physical evidence from the scene of Somsri's killing was not consistent with Petitioner's statements that Petitioner had fumbled with the gun and that it had accidentally discharged. Englert noted that the measurements of the bullet holes did not match up with the position in which Somsri's body was found, nor with a shot having been fired six feet away with the muzzle of the rifle no more than a foot from the ground, as Petitioner had described. Englert also commented that Somsri could not have been shot while in the position she was found in because in the photographs, Somsri's head was lying on the entry wound, so that the entry wound was nearly covered by the pillow.

Lance Martini used information Lawrence provided to perform calculations regarding the trajectory of the bullet. According to Martini, factors such as gravity and bullet deflection due to ricocheting are generally not very significant over short distances. Martini concluded that the bullet would likely have traveled on a fairly straight path. Martini calculated the approximate angles from which Somsri would have had to have been shot, given varying distances between the gun, the love seat, the wall, and Somsri's head. He concluded that the closer Somsri's head was to the wall, the steeper the bullet angle would have had to have been.

Martini also commented on the safety features of the Ruger rifle. According to Martini, Ruger rifles are test fired before they are sold. Martini noted that this type of gun has several internal safety mechanisms, and that the only way the firearm will discharge is if the trigger is pulled while the safety mechanism is in the "off" position. If for some reason a gun like this did go off as a result of being dropped, "the damage to the rifle and the mechanism would be so catastrophic you might get one discharge, but that would be it." Martini also noted that the Ruger rifle Petitioner owned in 1973 had never been recalled by the manufacturer for defects.

Martini testified that having excess oil on and inside the Ruger would have caused problems with operating the gun, and noted that the gun manual recommended not using excessive oil on the gun. In particular, excessive oil in the barrel of the rifle could obstruct the bullet and could "result in catastrophic failure should live ammunition be fired. . . ." Additionally, there is no reason to oil the wood parts of a gun like the Ruger; doing so would discolor and warp the wood, "potentially causing a problem."

Based on the coroner's report, Martini believed that the barrel of the gun was either next to Somsri's skin or a half-inch away when she was shot. Martini explained that the characteristics of a wound such as Somsri's are typically caused by a contact or close distance discharge. According to Martini, the absence of stippling is characteristic of close proximity discharges, because the

gunpowder particles would be driven into the wound. There would not have been time for the particles to spread out and impact the surface of the skin. Martini also said that Somsri's dark hair would have "block[ed] the disposition of the soot from reaching the scalp," and may have hidden the soot, because the dark soot matched Somsri's black hair. This, in combination with bleeding, would make detecting any soot difficult. Martini admitted that he could not rule out the possibility that a high powered rifle, shot from six feet away, could have created the type of stellate laceration found on Somsri's head.

DiMaio, the Bexar County, Texas medical examiner, also reviewed the autopsy report and examined the photographs that were taken at the scene. He opined that Somsri had sustained a contact wound from a .44-magnum bullet. He based this opinion on information contained in the autopsy report, including the descriptions of the 12-centimeter stellate entrance wound and the large exit wound. According to DiMaio:

> [T]he stellate wounds are typically seen in the head from contact wounds, which is when the muzzle of the gun is against the head. The bullet goes out the muzzle and produces a round hole approximately 10 to 12 millimeters in diameter. And right behind the bullet comes gas at about 20- to 25- to 30,000 pounds per square inch of pressure, follow[ing] the bullet through the hole. [¶] The bullet enters a hole through the skin. The gas tries to get through. What happens is the gas starts to diffuse. And the fuse is between the scalp and the bone because it can't all get through that hole. And when it does, it kind of, you know, dissects and then balloons out the skin. And it balloons out such that it exceeds the elastic capability of the skin to absorb stretching. It tears. So you get tears, and you get, basically, a stellate wound from contact wounds.

DiMaio acknowledged that it is theoretically possible for a stellate wound to form from a distance wound, but that this usually "doesn't happen." In such a case, the wound would be much smaller than the 12-centimeter wound found on Somsri's head.

DiMaio also considered the type of ammunition that was used in explaining why the injury looked the way it dId. He noted that the bullet was a pistol cartridge rather than a rifle cartridge, and that it therefore traveled with less velocity than a rifle bullet would have traveled. "[T]he kinetic energy, the energy that the bullets ha[ve] to wound is dependent on two factors. One is weight, and the other one is the velocity." DiMaio opined that because a pistol cartridge was used, damage of the kind that was found on Somsri's head would not have been seen unless the gun had been placed immediately next to Somsri's head and fired.

When asked whether the lack of soot found around the wound altered his opinion that the wound was a contact wound, DiMaio explained that it did not, because the ammunition was designed to be fired from a handgun with a much shorter barrel. Since the bullet had to travel down an 18-inch barrel, any soot would likely have been deposited along the length of the barrel, with very little or no soot exiting the barrel. Further, any soot that may have exited would likely have been "washed away in the blood." DiMaio further opined that at the time Somsri was shot, her head could not have been in the position it was when police first saw her, because the entry wound was covered by the pillow, and there was no damage to the pillow.

Petitioner did not testify. The defense presented Patricia Lough, a criminalist who had retired from the San Diego Police crime laboratory. Lough testified that she was being sued by Rod Englert. Lough had observed Englert's testimony in an earlier case, and had then visited the crime scene in that case herself. Based on her observations, Lough believed that Englert's interpretations and observations were incorrect in a number of significant respects. Lough notified the deputy district attorney of errors she perceived in Englert's analysis. However, the prosecutor chose to use Englert's interpretations rather than those of the crime lab team. After trial, Lough filed an ethics complaint against Englert with the American Academy of Forensic Science. As a result of Lough's complaint, Englert was required to alter some portion of his resume and submit

1  it to the Academy for approval, if he wanted to remain a member. Lough had not been given any
2  information regarding the specifics of this case, and did not testify as to the particular circumstances or evidence of Somsri's death.

3  (Lodgment 11 at 4-21.)

4  ### III. PROCEDURAL BACKGROUND

5  On August 17, 2005, an Amended Information was filed by the San Diego County District

6  Attorney charging Petitioner with murdering Phyllis New in 2004 (Cal. Penal Code § 187, (a)) in

7  Count One and with murdering Somsri New in 1973 (Cal. Penal Code § 187, (a)) in Count Two.

8  Special circumstance of multiple murders was alleged as to Count One (Cal. Penal Code § 190.2,

9  (a)(3)) along with the special allegation he personally discharged a firearm when committing that

10  murder (Cal. Penal Code § 12022.53, (d)). As to Count Two, it was specially alleged he personally

11  used a firearm in committing that murder.  (Cal. Penal Code § 12022.5, (a)). (Lodgment 1.)

12  On October 17, 2005, Petitioner filed his motion to dismiss the 1973 murder charge based

13  on an unjustified pre-accusation delay in prosecuting that 1973 murder. (Lodgment 2.)  The motion

14  was opposed by the district attorney.  (Lodgment 3.)

15  Petitioner also filed his motion to sever the two murder charges from one another and for

16  separate trials to be conducted for each charge. (Lodgment 4.)  The motion was opposed by the

17  district attorney. (Lodgment 5.)

18  On December 1, 2005, after reading and considering the parties' pleadings pertaining to

19  Petitioner's motion to dismiss and his motion to sever and listening to counsels' argument, the

20  trial court denied both motions. (Lodgment 6; *see* Lodgment 7, at 40-50.)

21  On February 16, 2006, jury trial commenced, and on March 16, 2006, the jury found

22  Petitioner guilty of the first degree murder of Phyllis and Somsri, and the jury found true the

23  special circumstance allegations alleged as to both murders. (Lodgment 8.)

24  On April 13, 2006, Petitioner was sentenced to prison for life without the possibility of

25  parole for murdering Phyllis (Count One) plus a consecutive twenty-five years to life for using a

26  firearm to commit that murder.  He was sentenced to a consecutive life term with the possibility

27  of parole for murdering Somsri (Count Two) plus a consecutive five years to life for using a

28  firearm to commit that murder.  (Lodgment 9.)

1       On June 13, 2007, Petitioner appealed his conviction to the California Court of Appeal in

2 case number D048487. (Lodgment 10.) On May 28, 2008, the conviction was affirmed in a reasoned

3 decision by that court. (Lodgment 11.)

4       On June 17, 2008, Petitioner filed his Petition for Review in the California Supreme Court

5 seeking review of the appellate court's decision.  On August 27, 2008, that court summarily

6 denied the petition. (Lodgment 12.)

7       On November 18, 2009, Petitioner filed the underlying Petition in this Court seeking federal

8 habeas relief. (Doc. 1.)  On March 14, 2010, Respondent filed his Answer to the Petition.  (Doc. 8.)

9 On May 4, 2010, Petitioner filed his Traverse.  (Doc. 11.)

10                       **IV. DISCUSSION**

11    **A.**     **Standard of Review**

12       This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty

13 Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas

14 petition will not be granted with respect to any claim adjudicated on the merits by the state court

15 unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable

16 application of clearly established federal law; or (2) resulted in a decision that was based on an

17 unreasonable determination of the facts in light of the evidence presented at the state court

18 proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state

19 prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the

20 state court's determination; rather, the court applies an extraordinarily deferential review, inquiring

21 only whether the state court's decision was objectively unreasonable.  *Yarborough v. Gentry*, 540

22 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  Additionally, the state

23 court's factual determinations are presumed correct, and Petitioner carries the burden of rebutting

24 this presumption with "clear and convincing evidence."  28 U.S.C.A. § 2254(e)(1) (West 2006).

25       A federal habeas court may grant relief under the "contrary to" clause if the state court

26 applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a

27 case differently than the Supreme Court on a set of materially indistinguishable facts. *Bell v. Cone*,

28 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if

1  the state court correctly identified the governing legal principle from Supreme Court decisions but

2  unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the

3  "unreasonable application" clause requires that the state court decision be more than incorrect or

4  erroneous; to warrant habeas relief, the state court's application of clearly established federal law

5  must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

6        Where there is no reasoned decision from the state's highest court, the Court "looks through"

7  to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the

8  dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must

9  conduct an independent review of the record to determine whether the state court's decision is

10  contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado*

11  *v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-

12  76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not

13  cite Supreme Court precedent when resolving a habeas corpus claim. *Early*, 537 U.S. at 8. "[S]o

14  long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court

15  precedent,]" *Id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

16  Clearly established federal law, for purposes of § 2254(d), means "the governing principle or

17  principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*,

18  538 U.S. at 72.

19        Where a petitioner alleges a state court decision is based upon an unreasonable determination

20  of the facts in light of the evidence presented in state court, he or she must demonstrate that the

21  factual findings upon which the state court's adjudication rests is objectively unreasonable. *Miller-*

22  *El v. Cockrell*, 537 U.S. 322, 340 (2003).

23        **B.**    **Analysis**

24        Petitioner raises two claims in his Petition. First, Petitioner contends the delay in bringing

25  the 1973 case for a period of 32 years, long after memories had faded, central witnesses had died,

26  and evidence had been destroyed, denied Petitioner due process of law. (Doc. 1 at 30-52.) Second,

27  Petitioner contends he was deprived due process of law and a fundamentally fair trial when the trial

28  court refused to sever Count One, relating to the death of Phyllis New, from Count Two, relating to

the death of Somsri New.  *Id.* at 52-60.

As to claim one, Respondents contend Petitioner was not denied due process of law as a result of pre-indictment delay because Petitioner did not show actual prejudice when balanced against the justification for the delay.  (Doc. 8-1 at 23-46.)  As to claim two, Respondents contend the state court's denial of Petitioner's pretrial motion to sever the two murder trials was not contrary to federal law because evidence of the two charges were cross-admissible, and the case involving Somsri's murder was not weaker than the case involving Phyllis' murder.  *Id.* at 46-55.

## 1.    Pre-Indictment Delay

Petitioner claims the state court deprived him of a fair trial, guaranteed by the Fifth and Fourteenth Amendments, by allowing Petitioner's case to proceed to trial in 2006 on a 1973 allegation.  (Doc. 1 at 30-52.)  First, Petitioner contends there is no question Petitioner suffered the requisite, non-speculative prejudice from the 32-year delay in charging him with the 1973 murder.  *Id.* at 32-48.  Second, Petitioner asserts the state courts' holding that the state's legitimate justification in the delay outweighed the prejudice suffered by the Petitioner constituted an unreasonable application of federal law.  *Id.* at 49-52.  Based thereon, Petitioner requests this Court to reverse his convictions, and remand the case for further proceedings.  *Id.* at 33.

Respondents contend Petitioner was not denied due process of law as a result of pre-indictment delay because Petitioner did not show actual prejudice when balanced against the justification for the delay.  (Doc. 8-1 at 23-46.)  Specifically, Respondents contend the state courts' finding that law enforcement's discovery 32 years after Somsri died that her death was the result of murder and not by accident justified the state's delay in charging Petitioner with her murder.  *Id.* at 23.

### a.    Clearly Established Federal Law

Clearly established federal law provides that in order to demonstrate a violation of his Fifth Amendment right to due process based on pre-indictment delay, as made applicable to the states through the Fourteenth Amendment, *see Ingraham v. Wright*, 430 U.S. 651, 673 (1977), Petitioner must carry a heavy burden to prove actual, non-speculative prejudice to his defense from the delay.  *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992), citing *United States v. Lovasco*, 431 U.S. 783, 790 (1977); *Shaw v. Terhune*, 353 F.3d 697, 702 (9th Cir. 2003) (noting that Ninth Circuit

1  case law may be persuasive authority for determining what is clearly established federal law).  If

2  Petitioner demonstrates actual prejudice, the Court must balance the length of the delay against the

3  government's reason for the delay to determine whether the delay "violates those 'fundamental

4  conceptions of justice which lie at the base of our civil and political institutions,' which define 'the

5  community's sense of fair play and decency.'"  *Lovasco*, 431 U.S. at 790 (citations omitted);

6  *Huntley*, 976 F.3d at 1290.

7                    *b.    Procedural Background on Motion to Dismiss*[7]

8           On October 17, 2005, Petitioner filed a motion to dismiss the 1973 murder charge based

9  on an unjustified pre-accusation delay in prosecuting that 1973 murder. (Lodgment No. 2.)

10  Petitioner asserted he accidentally shot Somsri and maintained that evidence regarding the trajectory

11  of the bullet was therefore particularly important to his defense.  *See Id.* at 39.  Petitioner argued the

12  delay in charging him with Somsri's murder caused him prejudice because Dr. Irving Root, who

13  performed the autopsy on Somsri, and L.B. Reyes, the coroner on the scene, had both died and were

14  unavailable to testify.  *Id.* at 40.  Further, Petitioner complained that the loss or destruction of

15  autopsy photographs, the rifle involved in the shooting, the furniture from the living room, including

16  the love seat on which Somsri was lying when she was shot, and statements Petitioner made to the

17  police caused Petitioner prejudice.  *Id.* at 44-59.

18           To address the issues presented in this motion, the trial court evaluated the circumstances

19  leading to and surrounding Somsri's 1973 death and  Phyllis' 2004 death.  Therefore, the

20  preliminary hearing evidence pertaining to Somsri's and Phyllis' deaths are set forth below:

21                            *i. Phyllis New's Death (2004)*

22           San Diego Deputy Sheriff Patric McEvoy was dispatched to space 131 in a mobile
   home park in Santee, California, at 4:02 a.m. on October 15, 2004. (Lodgment No. 13 at 4-5.)
23  Upon his arrival, he saw a man outside of the mobile home. McEvoy and other deputies entered the
   mobile home searching for anyone who may have been inside. When McEvoy entered the bedroom,
24  he saw a motionless woman, Phyllis New, laying face down in the bed and the bedroom appeared to
   be ransacked. Several top drawers of the dressers were open and the clothing in them appeared to
25  have been rifled through. One of the deputies checked Phyllis for vital signs. The bed covers were

26  ─────────────────

27          [7] The trial court ruled on Petitioner's motion to dismiss for prejudicial preaccusation delay prior
   to the commencement of trial.  In ruling on the motion, the court considered evidence that the parties
   had presented at the preliminary hearing.  The evidence that the prosecution presented at the preliminary
28  hearing was substantially similar to the evidence the prosecution eventually presented at trial.
   Therefore, the Court provides testimony from the preliminary hearing as additional background
   regarding the hearing on Petitioner's motion to dismiss.

pulled up to her neck. (Lodgment No. 13 at 6-8, 15, 27.) A screen from an open bedroom window had been removed. (Lodgment No. 13 at 9, 12.) Drawers from a jewelry cabinet had been removed and propped up against the cabinet and jewelry was strewn on the floor. (Lodgment No. 13 at 9.) Other than the disturbance in the bedroom, McEvoy noticed the rest of the mobile home was immaculate. (Lodgment No. 13 at 16.) No weapons were found in the home. (Lodgment No. 13 at 17.)

Deputy McEvoy looked around the outside of the mobile home. He found an overturned bucket beneath the open bedroom window and the screen to the window was lying on a nearby trash can. The layer of dirt on the bottom of the bucket had not been disturbed, there were no footprints in that area and the layer of fine dust on the windowsill of the bedroom window had not been disturbed. (Lodgment No. 13 at 18-19.)

Deputy McEvoy obtained Petitioner's permission to retrieve Phyllis' driver's license from her purse. McEvoy found the purse hanging on the inside doorknob of the bedroom door. Phyllis' purse was open and contained a digital camera, cellular telephone, her wallet and checkbook. Nothing in the purse appeared to have been rifled through. (Lodgment No. 13 at 20-21.)

Deputy Ron Sakamoto testified he was also dispatched to Petitioner's mobile home and talked to Petitioner when he arrived at the scene. Petitioner told the deputy because Phyllis asked Petitioner to purchase her medicine for her migraine headache, he went to a store, purchased the medicine and returned to the mobile home 30 minutes after leaving the store. When he returned, he saw the front door of the home open. He went inside and found Phyllis in bed, rolled her over and saw she was bleeding from her ear. He then called the emergency operator. (Lodgment No. 13 at 104-106, 110.) Petitioner was calm when he spoke to the deputy. (Lodgment No. 13 at 112.) Petitioner was not able to tell Sakamoto the time that Petitioner arrived at the store to buy the medicine. (Lodgment No. 13 at 108.)

Paramedics Aaron Huisman and Fred Daunis arrived at Petitioner's mobile home at 4:08 a.m., within seven minutes of being dispatched, on October 15, 2004. (Lodgment No. 13 at 123, 129-130; Lodgment No. 15 at 443.) Daunis saw that Phyllis' skin was becoming mottled, e.g., discolored by blood pooling under the skin after the heart stops, and she was bleeding from her nose and mouth onto a pillow. The blood did not appear fresh but appeared to have been there for a period of time. (Lodgment No. 15 at 445, 452-453, 461.) Daunis grabbed her arm to determine if rigor mortis had set in and found her arm limber but cool to the touch. (Lodgment No. 15 at 446.)

Daunis watched as Huisman moved Phyllis' jaw and reported rigor mortis was setting into her jaw. Huisman saw her skin was ashen and noticeably cool to the touch. She also had bruising on her back. (Lodgment No. 13 at 132-135, 139; Lodgment No. 15 at 450-451.) At that time, the paramedics declared her dead. (Lodgment No. 13 at 30; Lodgment No. 15 at 451.) Daunis knew from his training and experience, rigor mortis of a person's jaw usually sets in within two and four hours from the time of death and mottling begins within that same time frame. (Lodgment No. 15 at 455, 458-459.)

Forensic examination of the bullet that killed Phyllis determined it to be a hollow point .22 magnum caliber bullet. (Lodgment No. 13 at 115.) 11 guns were determined to have likely fired the bullet. No gun was found that created the grooves in the bullet that killed Phyllis. (Lodgment No. 13 at 120.)

Steven Campman, the pathologist who examined Phyllis at the crime scene at 4:30 a.m. on October 15, observed gunpowder in the form of small dark spherules on her pillow, her bed and her headboard. (Lodgment No. 16 at 484-486.) With regard to Phyllis' injury, Campman noted her body was cool to the touch and was in full rigor mortis and lividity was present. She had a wound in the occipital area of her head, slightly right of midline that was circled by a ring of unburned gunpowder, dried blood and gunpowder were around the edges of the wound and had one rivulet of blood was coming from the wound. (Lodgment No. 16 at 486-488, 493-494.) He opined lividity and rigor mortis generally become noticeable within two to four hours after a person's death;

- 15 -

he opined she was shot two to four hours prior to 4:00 a.m. (Lodgment No. 16 at 489-490, 508-509.) He determined her death was caused by a small caliber bullet entering her head from the back, traveling to and lodging in the left front of the brain. (Lodgment No. 16 at 492-493, 498.) He opined the bullet was fired into Phyllis' head from a range of less than an inch to three feet away from her head. (Lodgment No. 16 at 502.)

Detective Patrick Gardner supervised the collection of evidence at Petitioner's mobile home. Among the items seized were Petitioner's car keys that were retrieved from the kitchen counter. (Lodgment No. 16 at 526, 528.) The keys were later swabbed for gunshot residue and the swabs were sent to the Los Angeles Coroner's office for testing. The test showed the keys had particles of gunshot residue on them. (Lodgment No. 16 at 526-528, 558.) He also saw the bedroom had visible signs of having been ransacked, e.g., some dresser drawers were pulled out as were some jewelry cabinet drawers, but the rest of the mobile home was tidy and clean; the only place where items were thrown on the floor was in the bedroom. (Lodgment No. 16 at 529-531, 534.) One of the two open bedroom windows was missing a screen and the second window was noisy when it was opened and closed. (Lodgment No. 16 at 535-536.) Neither the screen that was taken off a bedroom window nor the overturned bucket beneath that screenless window had identifiable finger prints on them. (Lodgment No. 16 at 567-568.)

Detective Gardner found medicine on the kitchen counter with a receipt bearing the time, 3:49, that morning as the time the medicine was purchased. (Lodgment No. 16 at 536.) Using Petitioner's statements to investigating officers describing the route he drove to pick up the medicine for Phyllis, the detective later drove that route. The detective found the travel time from the mobile home to pick up the medicine was seven minutes and the travel time to return to the mobile home was nine minutes. (Lodgment No. 16 at 536-537.)

Detective Gardner remembered Petitioner telling him that Phyllis awoke in the middle of the night, at about 3:00 a.m., because of a migraine headache and said she did not want the pain killers that she had in the residence but accepted his offer that he drive to a drug store and purchase her different medicines. Petitioner said he locked the front door of the mobile home before driving to a drug store, spent some time in the store, purchased the medicine and drove back to the mobile home; he said he was gone from the home for about 45 minutes. He said he found the front door open, felt uneasy, put the medicine down on the kitchen counter and went into the bedroom. He said he saw the bedroom drawers open, found Phyllis in bed, unsuccessfully tried to awaken her by shaking her arm but not by moving her, saw blood, backed out of the bedroom and called the 9-1-1 operator for assistance from a portable telephone in the kitchen. (Lodgment No. 16 at 546-548.) Petitioner said upon seeing blood, he "freaked out" and backed out of the bedroom. (Lodgment No. 16 at 555.) He acknowledged that Phyllis was concerned that he had problems finding continuous employment. (Lodgment No. 16 at 556.)

Petitioner also told Detective Gardner that his first wife, Somsri, "died in an accident" and later revealed he shot Somsri when he was cleaning his gun; however he claimed not remembering what part of Somsri was struck by the bullet. (Lodgment No. 16 at 552-553.) Petitioner had earlier told other officers Somsri had died as a result of a car accident. (Lodgment No. 16 at 553, 592.)

Detective Gardner said that he found odd the fact the front door of the residence was wide open. (Lodgment No. 16 at 538-539.) He also found odd that many valuable items including jewelry were not taken by the intruder, the ransacking of the bedroom drawers was minimal and did not occur in the other rooms and that Petitioner's home, the burglary target, was in the middle of a large mobile home park. (Lodgment No. 16 at 540, 554.) He also found odd the fact the thin layer of dust on the window ledge of the window, from which the screen was removed, was not disturbed and the layer of dirt on the bucket beneath that window was not disturbed. (Lodgment No. 16 at 541.) He also found odd the thin layer of dust on the jewelry boxes in the bedroom had not been disturbed despite the bedroom containing miscellaneous jewelry. (Lodgment No. 16 at 541-542.) He also found odd that Phyllis had one pain pill in her purse and two pain pills in a kitchen drawer. (Lodgment No. 16 at 542.)

Detective Gardner also found odd when he talked to Petitioner a week after the killing, Petitioner said that several pieces of jewelry were missing and possibly a watch worth thousands of dollars was missing. Petitioner never gave him a list or description of that missing jewelry. (Lodgment No. 16 at 543-544.)

Carol Espinoza was Phyllis' neighbor and co-worker. (Lodgment No. 15 at 462.) The day before her death, Phyllis was uncharacteristically distant and abrupt to Espinosa. (Lodgment No. 15 at 465-466.) When she spoke to Phyllis the night before Phyllis' death, Phyllis said she was upset with Petitioner because he had lied to her and that she was going to follow him to his job the next morning and he was going to have to show her his earnings or his time card. (Lodgment No. 15 at 467-468, 471-472.) Espinoza discovered Phyllis had been killed the following morning. (Lodgment No. 15 at 473.) At Phyllis' funeral celebration, Petitioner asked Espinoza about how he could find out about the insurance benefits he was to receive as Phyllis' surviving spouse. (Lodgment No. 15 at 473-474, 476.)

Nancy Finley, who was living with Phyllis's son and Petitioner's stepson, Marc New, thought that Petitioner was recently employed in October 2004. (Lodgment No.13 at 40, 44.) She recalled when Phyllis and Petitioner moved to their Santee mobile home, Marc took all of Petitioner's guns. (Lodgment No. 13 at 59-60, 72-73.)

Marc New, said in January 2004, he helped Phyllis control Petitioner's spending by opening new accounts in only Phyllis' and Marc's names and purchased a safe for the credit cards and checkbooks. Phyllis put Petitioner on an allowance. (Lodgment No. 13 at 69-70, 92.)

In June 2005, Marc was told by Petitioner's lawyer to go to Petitioner's and Phyllis' mobile home to retrieve Phyllis' jewelry. Marc found a cloth bag of her jewelry in a compartment under her bed. The bag of jewelry also contained her wedding ring. (Lodgment No. 13 at 79-80.) Prior to Petitioner's arrest, Marc talked to him about finding Phyllis' wedding ring; Petitioner seemed concerned about finding the wedding ring but did not talk to Marc about the ring on the telephone. (Lodgment No. 13 at 81.)

### ii. Somsri New's Death (1973)

Robert Martinez, a San Bernardino police officer on September 9, 1973, was dispatched, along with his training officer, to Petitioner's San Bernardino home at 8:00 p.m. to investigate a shooting. When he arrived at the scene, no other officers had yet arrived. (Lodgment No. 14 at 200.) He met Petitioner and an unidentified woman outside of the residence. Petitioner directed him into the residence. (Lodgment No. 14 at 201, 208.) At some point, Petitioner told Martinez that he was in the residence, sitting on the couch watching television while cleaning his rifle, he put four bullets into the gun, he pointed the rifle at the ceiling, he began ejecting bullets from the weapon, he fumbled the weapon, the gun accidentally discharged, he saw blood on his wife's neck and he immediately called the operator to call for an ambulance. Petitioner said he was seated when the rifle discharged. (Lodgment No. 14 at 202, 208, 210-211.) Petitioner did not tell Martinez that Petitioner attempted to give first aid to Somsri before he called the operator. (Lodgment No. 14 at 211.)

Prior to Martinez entering Petitioner's residence, Martinez asked out loud to the people around him whether anyone had checked to see if Somsri was still alive. Because he had the impression that no one had checked to see if she were alive prior to his arrival, he entered the residence. (Lodgment No. 14 at 206-207.) Upon entering the residence and living room he saw a rifle on the ground and woman motionless on a love seat. He checked Somsri for a pulse but found none. He did not move her to check her pulse. (Lodgment No. 14 at 202-204, 216.) He also saw brain matter on the left side of Somsri's head and on the love seat. (Lodgment No. 14 at 205.) He saw a gun lying on the ground between a sofa and table. (Lodgment No. 14 at 217.) He said the pictures taken of the shooting scene accurately showed Somsri's position on the love seat and accurately showed the location of blood and brain matter when he initially saw her. (Lodgment No. 14 at 213-214.)

Martinez said he remembered the circumstances of that shooting because it was the first dead body incident he investigated after he graduated from the police academy. (Lodgment No. 14 at 212.) He wrote a report about the shooting incident. (Lodgment No. 14 at 200, 218.) While his report contained the fact he escorted an unidentified woman, whom he presumed to be the owner of the residence that Petitioner was renting, back to her residence, Martinez did not write down the woman's name. (Lodgment No. 14 at 221.)

Nathan Rushing and John Fields, both San Bernardino police officers on September 9, 1973, were also dispatched to Petitioner's residence. (Lodgment No. 14 at 231-234, 284.) When Rushing and Fields went inside the residence, they saw a rifle on the ground next to a sofa along the north wall, Somsri lying on a love seat along the east wall, she had a wound low behind her right ear, a large portion of the left side of her head was missing, blood and brain matter were on the love seat next to her head and a large blood splatter was on the east wall and north of her head. (Lodgment No. 14 at 238, 242, 246-247, 265, 294-297.) There was no blood or blood splatter on the pillow on which her head was resting. (Lodgment No. 14 at 249, 279.) Rushing saw the rifle was heavily coated with oil from the barrel tip to the butt of its stock. (Lodgment No. 14 at 234.) A box of ammunition was on the nearby coffee table along with the gun's owner's manual and three bullets loose from the box of ammunition had oil on them. (Lodgment No. 14 at 235-236, 260, 271.) Ammunition reloading equipment was in a nearby room; at least two different calibers of ammunition were in the room as was gunpowder. (Lodgment No. 14 at 254- 256.) He did not see any gun cleaning rods or patches in the room. (Lodgment No. 14 at 261.)

Fields began collecting evidence from the scene. Evidence collected included the rifle, bullets, gun oil, rifle instruction booklet, an expended cartridge from the kitchen floor and bullets. (Lodgment No. 14 at 285-289.) He also measured the bullet hole in the wall, behind the love seat, to be 19 ½ inches above the floor. (Lodgment No. 14 at 292-293.) He retrieved a smashed bullet from the hole in the wall. (2PHT 293-294.) If the pillow that Somsri's head was lying upon had a bullet in it, Fields would have collected it; he did not collect the pillow. (Lodgment No. 14 at 300.)

Rushing also saw Petitioner demonstrate how he was cleaning the rifle when it discharged: Petitioner sat in the middle of the three-seat sofa, showed how he was holding the rifle and ejecting bullets from the rifle, showed how the gun slipped from his hands and that he caught the gun about six to 12 inches from the floor when it fired a bullet. According to Petitioner, the gun did not hit the floor when it discharged the bullet. (Lodgment No. 14 at 238-241, 243, 268-270, 281.) The fact Petitioner demonstrated to police how he was cleaning the rifle when he fumbled it, grabbed it and that it discharged a bullet at Somsri, was not put into Rushing's police report; Rushing independently remembered Petitioner performing that demonstration. (Lodgment No. 14 at 269-270, 281.)

Rushing said when Rushing cleaned a gun, he would put oil on the moving parts of the gun. He would not put oil on the barrel and not on the wood parts of the gun. (Lodgment No. 14 at 241-242.)

When Somsri's body was removed from the love seat, Rushing and Fields saw large amounts of blood and brain matter on the back cushion of the love seat. (Lodgment No. 14 at 244, 248, 299-300.) Rushing saw an exit hole from the back of the love seat and a bullet hole in the east wall; he did not measure the distance of either hole from the floor and they visually appeared to be in line with each other. (Lodgment No. 14 at 250, 253, 258, 267.) A large pool of blood was on the floor beneath the north end of the love seat. (Lodgment No. 14 at 251-252.)

Rushing did not recall the distance between the love seat and the east wall while Somsri was lying on it. (Lodgment No. 14 at 266-267.)

Arthur Yeakel, a San Bernardino police officer on September 9, 1973, when he was dispatched to and arrived at Petitioner's San Bernardino home at 8:00 p.m. (Lodgment No. 14 at 150-151.) Other officers and attendants from the Courtesy Ambulance Company had already arrived

at the scene. The ambulance attendants were leaving as Yeakel arrived. (Lodgment No. 14 at 152, 162, 166-167.) He prepared a one and one-half page report and drew a diagram of the scene which depicted, among other matters, the front door of the residence, Petitioner's wife, Somsri, who was lying on a love seat under a plastic sheet, a larger three-seat sofa, a rifle on the ground, a table in the corner of the living room a table near the sofa, a multi-purpose room, the bedroom and kitchen. (Lodgment No. 14 at 153-157, 159, 164, 167.) He also measured the distance between certain items in the living room and his measurements were accurate within one-half inch. (Lodgment No. 14 at 158-159.) Among the measurements he took was the distance between the rifle and other objects: The butt of the gun was four feet from the north wall (Lodgment No. 14 at 160-161) and nine feet from the entry way into the kitchen (Lodgment No. 14 at 159-160). He measured a pool of blood near the love seat upon which Somsri was lying to be three feet from the east wall and three feet, ten inches from the north wall. (Lodgment No. 14 at 161-162.) He also measured the distance from the right side of Somsri's head to the barrel of the rifle lying on the floor to be six feet. (Lodgment No. 14 at 162-163.) He did not measure the dimensions of the three-seat sofa or the love seat upon which Somsri was lying nor did he measure the distance of the sofa from the north wall. (Lodgment No. 14 at 168, 174-175.) He wrote in his report what Petitioner had told a responding officer, that "[h]usband of victim apparently accidentally shot his wife as he was cleaning the described weapon in living room when she was sleeping on love seat nearby." (Lodgment No. 14 at 172.) He also reported the weapon used was a Ruger carbine semi-automatic caliber 44-magnum. (Lodgment No. 14 at 173.)

Donald Saunders, a San Bernardino police officer on September 9, 1973, was dispatched to Petitioner's residence to take pictures of the scene including a rifle on the floor and Somsri's lifeless body lying on the love seat. (Lodgment No. 14 at 178-179.) He took both black and white and color pictures of the scene. (Lodgment No. 14 at 180-195.)

Gary Hilder, a San Bernardino detective on September 9, 1973, talked to Petitioner at the police station soon after the reported shooting of Somsri. Petitioner told Hilder that he was sitting on the sofa on the north side of the living room, Somsri was sleeping on the sofa on the east side of the living room, and he was cleaning his recently purchased a 44-caliber Ruger carbine. He said he was running ammunition through it, manually operating the bolt, when the rifle slipped from his grasp and when he reached to grab it as it fell to the floor, his finger hit the trigger and the weapon discharged and his wife was struck in the head by the bullet. (Lodgment No. 14 at 313-314, 316-317.) Petitioner also told Hilder that when he saw Somsri had been shot, he called the operator and asked that an ambulance be summoned. Petitioner then called his parents to let them know what had occurred. (Lodgment No. 14 at 316.) Hilder said Somsri's death was later classified to be an accidental shooting. (Lodgment No. 14 at 328-329.) Hilder said the police department had only four robbery/homicide detectives in 1973. (Lodgment No. 14 at 332.)

San Diego County criminalist Gene Lawrence looked at all the police reports pertaining to Somsri's death, viewed the photographs taken and determined whether Petitioner's 1973 statements to police, that he accidentally shot Somsri as she slept, was consistent with those reports and photographs. (Lodgment No. 14 at 335-336.) In the course of making that determination, Lawrence drove to Petitioner's former San Bernardino residence and measured between the floor and the east wall window sill and looked for the bullet hole in the east wall. No bullet hole in the east wall was found. (Lodgment No. 14 at 336-337.) The windowsill at the former residence was 32 inches above the floor. (Lodgment No. 15 at 369.)

Based on the photographs of the 1973 shooting scene and the police reports, Lawrence reconstructed approximate dimensions of the furniture in the living room in 1973 and also determined the trajectory of the bullet that struck and killed Somsri. He compared actual measurements of distances as reported in police reports to distances between objects and reference points depicted in the photographs and calculated a size ratio that he could use to approximate the dimensions of the objects and points of references shown in the photographs. (Lodgment No. 14 at 341-343.) Based on the size ratio he calculated, Lawrence opined the greatest concentration in the blood splatter on the east wall was at the bottom edge of the window sill which was about the height of love seat that Somsri was lying upon. Based on that information and the fact her hair against the

back cushion appears to be pulled up and away from her, as if her head had dropped, Lawrence opined Somsri's head was higher than depicted in the pictures when she was struck by the bullet. He would have also expected to see blood spray on the pillow upon which her head was resting if she were struck by a bullet in the position depicted in the photographs; however, no blood spray was visible on the pillow as depicted in the photographs. (Lodgment No. 14 at 345-356.)

Criminalist Lance Martini reviewed the pictures and coroner's and police reports of Somsri's death and used information developed by criminalist Lawrence. Based on that information, e.g., blood splatter and a bullet hole 19½ inches above the floor, he opined the bullet that struck Somsri had an 11 degree downward angle when she was struck. (Lodgment No. 15 at 397-398.) The 11 degree downward angle was determined from her position in the photographs and the bullet hole 19 ½ inches above the floor in the wall behind the love seat she was lying on. Based on criminalist Lawrence's calculations of the height of her head when she was actually struck by the bullet and the bullet hole in the wall, the downward angle of the bullet would have been 24 degrees. (Lodgment No. 15 at 432.)

Martini also opined the 12 centimeter stellate laceration to Somsri's head, as reported in her autopsy report, could have been caused by a close or direct contact of the gun being discharged no more than two inches away from her head. The close muzzle discharge forces gases from the bullet discharge under and tearing the surrounding skin. (Lodgment No. 15 at 405-407, 430.) He disagreed with Somsri's autopsy report conclusion that the bullet that struck her was fired at her from a distance. (Lodgment No. 15 at 431.)

Martini also obtained three Rugar rifles that were the same caliber and model as the one Petitioner used to shoot Somsri. (Lodgment No. 15 at 390-391, 394.) He tested each rifle with different types of ammunition in several different firing positions to determine the bullet ejection pattern of the gun. (Lodgment No. 15 at 391.) The guns were also tested for the weight of trigger pull for each gun and each gun was covered with excess oil on their exteriors and in their interior mechanism. (Lodgment No. 15 at 392.) He also researched the safety record for that model of gun and found the gun had not been recalled by the manufacturer nor had any safety warnings been issued on the operation of that model of gun. (Lodgment No. 15 at 395.)

Additionally, Martini explained that a close or direct contact gun discharge does not always result in stippling of the skin surrounding the wound because burning gunpowder particles are forced into the wound and not around the skin or because the particles are completely consumed before the bullet exits from the muzzle. (Lodgment No. 15 at 407-408.)

Finally Martini opined that while gun oil would be put on moving parts of a gun, it should not be put on ammunition to be fired from a gun nor in the barrel because oil build up could cause a malfunction. Similarly, gun oil is not put on wood parts of a gun because the oil will be absorbed by the wood and could discolor or warp the wood parts of the gun. (Lodgment No. 15 at 409-410.)

Pathologist Steve Campman testified a 12 centimeter stellate, e.g., star shaped, laceration is the result of a bullet wound to a person's head. (Lodgment No. 16 at 505.) Based on Somsri's autopsy report, Campman was able to show the jury, using a wig head, the bullet's entry point into Somsri's head. (Lodgment No. 16 at 506-507.) The autopsy report indicated the bullet traveled from the back of Somsri's head towards the front of her head in the same way that a bullet traveled from the back of Phyllis' head to the front of her head. (Lodgment No. 16 at 507- 508.)

On December 1, 2005, after hearing all argument and receiving all evidence, the court denied Petitioner's motion to dismiss.  (Lodgment 7 at 47.)  The Court held while Petitioner was prejudiced by the 32 years that elapsed before he was charged with Somsri's murder, that prejudice was outweighed by factors justifying the delay so that the resulting trial would not be unfair to Petitioner.

*Id.* at 44.  The court reasoned that under federal law, the prosecution did not gain any tactical advantage by waiting 32 years to try Petitioner.  *Id.* at 42.  The delay was justified because police investigators did not have sufficient evidence in 1973 to charge Petitioner with murdering Somsri. *Id.* at 42-43.  Petitioner was not deprived of a crucial witness by pathologist Dr. Root's death because Dr. Root's testimony would have been limited to his observations recorded in his autopsy report, which would be used in Petitioner's trial, and the prosecution stipulated to the contents of that autopsy report. *Id.* at 45.  No evidence that was recognized as having inculpatory or exculpatory value to Petitioner was destroyed by law enforcement between the 1973 crime and the filing of the murder charge.  *Id.* at 46-47, citing *California v. Trombetta*, 467 U.S. 479, 488, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984) (state has duty to preserve evidence that might be expected to play a significant role in the suspect's defense).

### c.    State Court Decision

Petitioner raised his claim regarding delay in the petition for review he filed in the California Supreme Court, which the Court denied summarily.  (Lodgment 12.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying this claim as the basis for its analysis. *Ylst*, 501 U.S. at 803.  The appellate court held the trial court did not err in denying Petitioner's motion to dismiss the 1973 murder charge involving Somsri.  (Lodgment 11.)  Citing *People v. Catlin*, 26 Cal. 4th 81 (2001), the appellate court noted that a defendant seeking to dismiss a charge as a result of delay in prosecution "must demonstrate prejudice arising from that delay," and the court must "balance[] the harm to the defendant against the justification for the delay."  *Id.* at 107. The state appellate court also noted "a claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant."  *Id.*  With these authorities in mind, the state appellate court held,"[a]lthough New was prejudiced by the delay in prosecuting that charge, the justification for the pre-accusation delay outweighs the prejudice to New caused by the delay."  (Lodgment 11 at 3.)

First, with regard to prejudice, the appellate court noted that Petitioner cited evidence pertaining to the circumstances of Somsri's death that had either been lost of was not available, including:(1) L.B. Reyes, the coroner who viewed the scene of the shooting is deceased; (2) Dr. Root, who performed the autopsy on Somsri's body is deceased; (3) the police are unaware whether

there were any photographs or audiotapes of Somsri's autopsy; (4) the rifle involved in the shooting could not be located; (5) a number of police reports had been purged; (6) a tape recording of New's 1973 interview was missing; (7) the identity of the woman with whom New was speaking when police arrived at the scene remains unknown; (8) the names of the paramedics who responded to the scene of the 1973 shooting remain unknown; (9) a detective did not know neighbors' identities, or whether they had been interviewed, did not know whether friends of the News had been identified or interviewed, and was unable to locate Somsri's prior place of employment; (10) the store where New purchased the rifle no longer exists; (11) furniture and physical evidence from the living room could not be found; (12) no canvassing of the area was undertaken to ascertain whether there were other witnesses. *Id.* at 28. The appellate court also noted that Petitioner asserts the only remaining items of evidence are a bullet fragment, 26 photographs that were taken at the scene, the coroner's report, the autopsy report, and some police reports from the coroner's file. *Id.* at 28-29.

To refute Petitioner's argument that the best means to rebut the prosecution's theory that Somsri's wound resulted from a close-range firing of the gun was through testimony from Reyes and Dr. Root, the appellate court held the following:

[A]s the trial court noted, the prosecution stipulated to Dr. Root's medical observations as stated in his report. Thus, New was able to present Dr. Root's observations and conclusions to the jury; the question at trial involved interpreting the meaning of those observations. Although Dr. Root's testimony would certainly have been useful in this regard, his testimony was by no means the only way the defense could have presented evidence that Dr. Root's findings indicated that Somsri was shot from a distance, and not from close-range, as the prosecution theorized. The defense could have called an expert to present his or her interpretation of Dr. Root's observations, just as the prosecution did. That expert would have relied on exactly the same evidence that was available to the prosecution's experts. Further, it is not at all clear that Dr. Root would have testified in the manner in which New's attorney assumes he would have. As the trial court noted, Dr. Root handled thousands more autopsies after Somsri's autopsy. In that time, forensic science had improved and Dr. Root's experience had deepened. It is thus not a certainty that Dr. Root would have maintained his position as set forth in his report that Somsri's wound was caused by a bullet fired from a distance. Finally, even if the missing evidence would have corroborated New's version of the distance and angle from which Somsri was shot, this would not have established, as New seems to implicitly suggest, that the shooting was not intentional.

(Lodgment 11 at 29-30.)

In response to Petitioner's argument that he was unable to question any of the paramedics who arrived at the scene about any disturbance they may have caused to the scene, the appellate court held:

Evidence from the preliminary hearing demonstrated that the testimony of the paramedics would not have been particularly significant. Officer Martinez testified that before entering the home when he first arrived, he asked everyone outside whether anyone had checked to see whether Somsri was still alive. No one indicated that they had, so Martinez entered the residence and carefully walked toward Somsri. He did not move her to check her pulse. Martinez testified that photographs that were later taken at the scene accurately reflected his best recollection of the position of Somsri's body when he first saw her. At least one other officer also testified that the photographs accurately depicted the scene as he found it. (Lodgment No. 11 at 30.)

With regard to physical evidence from the scene that was missing, the appellate court stated the following:

[T]he prosecution was able to present a love seat of similar dimensions to the one on which Somsri was lying when she was shot. New could have had experts use this love seat to demonstrate why the prosecution's calculations concerning the trajectory of the bullet and the distance from which Somsri was shot were wrong. New contends, however, that "cross-examination of reconstructed evidence is NOT the same as the ability to present and develop contrary original evidence." Assuming that this is true, the fact that original physical evidence is unavailable does not necessarily cause prejudice to a defendant to such a degree as to render the trial unfair.

(Lodgment 11 at 31.)

Based on the foregoing, the Court of Appeal held "the record supports the trial court's determination that any prejudice New might have suffered as a result of the delay in accusing him of Somsri's murder would not result in an unfair trial" (Lodgment 11 at 31.)

As to the second prong of the *Catlin* analysis, the state appellate court held, "there is ample evidentiary support for the conclusion that the prosecution's proffered justification for the lengthy delay in charging New with Somsri's murder was reasonable and substantial enough to permit the case to go forward despite the prejudice New might suffer as a result of the lengthy delay."

(Lodgment 11 at 31.) Specifically, the court held:

The record does not support New's assertion concerning the reason for the delay in accusing him of Somsri's murder. It was not simply advancements in forensic science or the prosecution's unwillingness to proceed in 1973 that lead prosecutors to reevaluate the circumstances of Somsri's death and to charge New with murdering her. Rather, Phyllis' death in 2004 was the critical factor that caused prosecutors to reexamine the circumstances of Somsri's death. Investigators became suspicious about whether Somsri's death had really been an accident after Phyllis also died as a result of a gunshot wound to the head. The existence of probable cause to arrest New for Somsri's murder was not apparent to detectives until after Phyllis was murdered. Rather than addressing this significant reason for the lengthy delay in charging him with Somsri's murder, New essentially ignores this fact in his briefing, and focuses instead on demonstrating how the missing evidence prejudiced him.

Only after the court requested supplemental briefing from the parties on this issue of relevance of Phyllis' murder to the justification for the delay in charging New with murdering Somsri did New address this new evidence. In supplemental briefing, New asserts that "there was no causal link between the 2004 investigation in to [sic] the death of Phyllis New and the three decade delay in prosecuting the defendant for the death of Somsri New. Nothing of any evidentiary

- 23 -

value turned up in the 2004 investigation of Phyllis New's death that was not available to the authorities during the 1973 investigation into the death of Somsri New.  Thus, there is no relevant connection between the two."

This claim is not persuasive.  The delay in charging New with Somsri's murder is indisputably linked to the 2004 murder of New's third wife, Phyllis.  The reopening of the investigation into Somsri's death would not have occurred *but for* Phyllis' murder.  Despite New's assertion to the contrary, something of evidentiary value clearly did "turn[] up in the 2004 investigation of Phyllis New's death that was not available...during the 1973 investigation" into Somsri's death–another of New's wives was found dead in her home, shot in the back of the head while sleeping.  This fact constitutes new evidence that could be used to establish that New did not accidentally shoot Somsri, as he claimed, but rather, that he shot her intentionally.  (See *Catlin*, *supra*, 26 Cal.4th at p. 109 ["By the time defendant was charged, of course, additional evidence of his guilt had emerged– particularly defendant's involvement in the paraquat poisoning of two more persons"].)

Although under California law a defendant need not show that the preaccusation delay was undertaken to give the prosecution a tactical advantage, the absence of such evidence is nevertheless relevant in the weighing of the prejudice to the defendant against the justification for the delay.  Here, there is no evidence that the delay occurred because the prosecution was attempting to gain a tactical advantage.  Phyllis' death and the circumstances surrounding it clearly provided the impetus for San Diego investigators to challenge the earlier conclusion of San Bernardino investigator's that Somsri's death was accidental.  With evidence of the murder of Phyllis, law enforcement officers were able to gather sufficient evidence to support charging New with murdering Somsri.  It is possible that, as New contends, the delay in charging him with Somsri's murder is in part attributable to the fact that law enforcement officers who conducted the initial investigation into Somsri's death were negligent in failing to detect and/or pursue inconsistencies in New's version of how the shooting occurred, and that a more thorough investigation at that time might have led to charges being filed against New in 1973.  However, officers did not know in 1973 that another of New's wives would later die from a gunshot would to the head.  The trial court concluded that without this information, there was simply not a prosecutable case in 1973.  There is substantial evidence to support this conclusion.  Further, even if the trial court had concluded that the delay in charging New with Somsri's murder was attributable in part to negligence in conducting the original investigation, there is no question that Phyllis' death in 2004 was a critical factor in the decision to charge New with murdering Somsri.  Although a more thorough initial investigation into Somsri's death at the time it occurred would clearly have been preferable both for the prosecution and the defense, the fact that New's third wife was killed under suspicious, and similar, circumstances in 2004, gave investigators reason to reopen the case regarding Somsri's death.  Thus, the trial court did not err in concluding that the justification for the delay in charging New with Somsri's murder outweighs any prejudice New may have suffered as a result of inadequate police investigation in 1973.

### d.    Discussion

The state appellate court applied the *Catlin* standard, a legal standard equivalent to the constitutional standard enunciated in *United States v. Lovasco*, 431 U.S. 783 (1977), as the appropriate framework for its analysis, and it did not decide this case differently than *Lovasco* on a set of materially indistinguishable facts.  (*See* Lodgment 11 at 23-24.)  In *Lovasco*, the Supreme Court held that in order to demonstrate a violation of his due process based on pre-indictment delay, Petitioner must first prove actual, non-speculative prejudice to his defense from the delay, and if Petitioner demonstrates actual prejudice, the Court must balance the length of the delay against the

- 24 -

government's reason for the delay to determine whether the delay "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' which define 'the community's sense of fair play and decency.'"  *Lovasco*, 431 U.S. at 790 (citations omitted). Specifically, the Court held, "[i]t requires no extended argument to establish that prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause." *Id.* at 790-91.  Further, the Court held that from the standpoint of prosecutors, potential defendants, law enforcement officials, and the court, "no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so." *Id.* at 791.  Because the *Catlin* standard is equivalent to the standard enunciated in *Lovasco,* the state court's decision is not "contrary to" clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.  Nor was the state court's conclusion– that the justification for the pre-accusation delay outweighed the prejudice to Petitioner caused by the delay–an unreasonable application of *Lovasco*.  431 U.S. at 783.

*i. Prejudice from the delay*

Petitioner contends the loss or destruction of material witnesses and virtually every piece of physical evidence has prejudiced him in his ability to defend against the prosecution's primary assertion that Somsri's wound was a contact wound and therefore inconsistent with Petitioner's claim he shot her accidentally.  (Doc. 1 at 34-49.)[8]

First, Petitioner contends the loss of Doctors Reyes and Root, the only medical professionals who ever examined Somsri's body, who concluded it was a distant range firing, and who both concurred that her death was accidental, caused him prejudice.  (Doc. 1 at 37-46.)  The state

---

[8] To support the prosecution's theory that Somsri's death was intentional, Criminalist Gene Lawrence went to the house in which Somsri was shot (which had partially burned down and been substantially remodeled) to make measurements to create a trajectory from which he estimated the location of Petitioner at the time the shot was fired. (12 RT 2101.)  While Dr. Root, who performed the autopsy, determined that this was a distant range shot, Lance Martini, relying on Lawrence's calculations, proffered that it was a near contact shot.  (12 RT 2141-42.)  Dr. DiMaio, a medical examiner who testified for the prosecution and also used Lawrence's reconstruction as the foundation for his attack of Dr. Root's report, concurred with Martini's conclusion that Somsri had suffered a contact wound. (12 RT 2427.)  This finding is fundamentally inconsistent with Petitioner's description of how the shooting occurred and provided a basis for the view that he intentionally murdered his first wife. (Doc. 1 at 35-36.)

appellate court found there was nothing to suggest that any prejudice Petitioner suffered as a result of these doctors' unavailability would result in an unfair trial.  (Lodgment 11 at 29-30.)  As the appellate court noted, the prosecution stipulated to the medical conclusions as stated in Dr. Root's autopsy report, so the defense was able to present Dr. Root's observations and conclusions to the jury.  *Id.* at 29.  The court further held, "[a]lthough Dr. Root's testimony would certainly have been useful in this regard, his testimony was by no means the only way the defense could have presented evidence that Dr. Root's findings indicated that Somsri was shot from a distance, and not from close-range, as the prosecution theorized."  *Id.*  The court suggested the defense could have called an expert to present his or her interpretation who could have relied on exact same evidence available to the prosecution's experts.  *Id.*  Moreover, "it is...not a certainty that Dr. Root would have maintained his position as set forth in his report that Somsri's wound was caused by a bullet fired from a distance."  *Id.*  Finally, the court found that even if Doctors Reyes and Root had testified consistent with their stated findings, this would not have proved that the shooting was unintentional, as claimed by Petitioner.  *Id.* at 29-30.

Second, Petitioner contends he was unable to question any of the paramedics who arrived at the scene about any disturbance they caused to the scene, which he contends is critical in light of the possibility that photographs that were taken at the scene did not accurately depict the location and placement of Somsri's body when officers arrived.  (Doc. 1 at 46-47.)  The state court found, however, that evidence from the preliminary hearing "demonstrated that the testimony of the paramedics would not have been particularly significant."  (Lodgment 11 at 30.)  Specifically, the court noted that Officer Martinez testified that prior to entering the home, he asked everyone outside whether they had checked to see if Somsri was alive.  *Id.*  Upon receiving no response, Martinez entered the residence and checked Somsri's pulse without moving her.  *Id.*  Martinez, and one other officer, testified that the photographs taken at the scene accurately reflected his best recollection of the position of Somsri's body when he first saw her.  *Id.*

Finally, Petitioner contends the loss of actual physical evidence prejudiced him.  (Doc. 1 at 47-48.)  Specifically, Petitioner asserts the rifle which killed Somsri and the furniture in the New house were gone.  *Id.*  Further, Petitioner asserts the photographs, which provided the foundation of the reconstruction by Lawrence which in turn became the heart of the prosecution's trajectory

analysis, could not fill the void left by the loss of actual physical evidence in this case. *Id.* The appellate court noted, however, that "the prosecution was able to present a love seat of similar dimensions to the one on which Somsri was lying when she was shot. New could have had experts use this love seat to demonstrate why the prosecution's calculations concerning the trajectory of the bullet and the distance from which Somsri was shot were wrong." (Lodgment 11 at 30-31.) Ultimately, the appellate court held, "the fact that original evidence is unavailable does not necessarily cause prejudice to a defendant to such a degree as to render the trial unfair." *Id.* at 31.

Based on the foregoing, this Court finds the appellate court's conclusion that "the record supports the trial court's determination that any prejudice New might have suffered as a result of the delay in accusing him of Somsri's murder would not result in an unfair trial" is objectively reasonable. *See Lockyer*, 538 U.S. at 75. Accordingly, the appellate court's decision as to prejudice did not involve an unreasonable application of clearly established federal law. *See Lovasco*, 431 U.S. at 790.

### *ii. Balancing delay against reason for delay*

Although Petitioner was able to demonstrate prejudice (albeit prejudice the appellate court concluded did not result in an unfair trial), this Court is still required to balance prejudice against the government's reason for the delay to determine whether the delay "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' which define 'the community's sense of fair play and decency.'" *Lovasco*, 431 U.S. at 790 (citations omitted).

Petitioner contends the "2004 investigation into the death of Phyllis New was simply irrelevant to any justification for the prior delay in prosecuting the 1973 death of Somsri New." (Doc. 1 at 49.) Specifically, Petitioner contends no dramatic advances in forensic science led to Petitioner's prosecution, and no new witnesses came forward to claim Petitioner intentionally killed Somsri. *Id.* at 50. Further, Petitioner argues the conclusions reached by officers and medical professionals in 1973 were open to investigation throughout the entire period of pre-indictment delay. *Id.* Petitioner contends "in its total reliance on the death of Phyllis New to justify this prejudicial delay, the Court confuses the *reason* prosecution was initiated with the *justification* for the lengthy period of delay that preceded it." *Id.* at 51. Phyllis New's death, Petitioner asserts, does not account for the failure of investigators to examine or reexamine the evidence collected in 1973.

1    *Id.*

2        Contrary to Petitioner's assertions, however, the state appellate court's finding that the trial

3 court did not err in concluding that the justification for the delay in charging Petitioner with

4 Somsri's murder outweighs any prejudice Petitioner may have suffered is objectively reasonable and

5 is supported by the record. The state appellate court found that "[t]he reopening of the investigation

6 into Somsri's death would not have occurred *but for* Phyllis's murder." (Lodgment 11 at 32-33.)

7 Specifically, the state court of appeal noted that "the existence of probable cause to arrest New for

8 Somsri's murder was not apparent to detectives until after Phyllis was murdered." *Id.* at 32. As the

9 state court of appeal stated, "[i]nvestigators became suspicious about whether Somsri's death had

10 really been an accident after Phyllis also died as a result of a gunshot wound to the head." *Id.* The

11 record reflects that both Somsri and Phyllis were found dead in their homes, shot in the back of the

12 head while sleeping. (Lodgment 13 at 6-8; Lodgment 14 at 172; Lodgment 16 at 492-493, 507-508.)

13 The court concluded Phyllis' death "constitute[d] new evidence that could be used to establish that

14 New did not accidentally shoot Somsri." (Lodgment 11 at 33.)

15        Further, the Court of Appeal held that the absence of evidence that the preaccusation delay

16 was undertaken to give the prosecution a tactical advantage was relevant in weighing the prejudice

17 to Petitioner against the justification for the delay. (Lodgment 11 at 33.)   The Court of Appeal

18 reasonably held that the record supported the trial court's conclusion that without evidence of

19 Phyllis' murder, "there was simply not a prosecutable case in 1973." *Id.* at 34.

20        Therefore, the fact that prosecutors did not charge Petitioner with Somsri's murder until after

21 Phyllis' death when they had probable cause does not deviate from "fundamental conceptions of

22 justice which lie at the base of our civil and political institutions" and which define "the

23 community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790; *Huntley*, 976 F.3d at 1290.

24 Certainly, a major consideration in the government's decision to prosecute Petitioner with Somsri's

25 murder was the similarity of Somsri's and Phyllis' deaths. It does not offend "the community's

26 sense of fair play and decency" for the prosecution to have waited to charge Petitioner with Somsri's

27 murder until they had new evidence to challenge the original investigators' conclusion that Somsri's

28 death was accidental , even if it was 32 years later. Accordingly, although Petitioner was able to

demonstrate prejudice, the Court finds that the length of the delay, balanced against the reasons for

1  the delay, did not violate "the community's sense of fair play and decency" nor any "fundamental

2  conceptions of justice."

3       Accordingly, the Court concludes that the adjudication of Petitioner's pre-accusation delay

4  claim by the state court was neither contrary to, nor involved an unreasonable application of, clearly

5  established federal law, and was not based on an unreasonable determination of the facts in light of

6  the evidence presented in the state courts. *See Lovasco*, 431 U.S. at 790.  Therefore, the Court

7  RECOMMENDS habeas relief as to this claim be **DENIED**.

8         **2.      Failure to Sever**

9       In his second claim, Petitioner contends his right to due process was violated by the trial

10 court's refusal to sever counts one and two for separate trials.  (Doc. 1 at 53-60.)  Petitioner contends

11 the Court of Appeal's conclusions, that the evidence was cross-admissible and that the court did not

12 err in failing to provide a limiting instruction, were not supported by the record and were

13 unreasonable under federal due process standards. *Id.* at 54.  With regard to cross-admissibility,

14 Petitioner contends "any similarities between the deaths of Somsri New and Phyllis New are

15 substantially outweighed by the dissimilarities between these events." *Id.* at 56.  Further, Petitioner

16 contends the refusal to sever the two counts clearly had a substantial and injurious effect on the

17 jury's verdicts because each case was bolstered by the other. *Id.* at 58-59.  Finally, Petitioner

18 contends "it is difficult to conceive of a case involving greater prejudice to the petitioner than this

19 one, where the failure to offer careful guidance to the jury [such as a limiting instruction] exposed

20 petitioner to the overwhelming likelihood of conviction based on impermissible use of character

21 evidence." *Id.* at 60.

22      Respondents contend the state court's denial of Petitioner's motion to sever was neither

23 contrary to federal law nor a misapplication of federal law.  (Doc. 8-1 at 47-55.)  Specifically,

24 Respondents contend the evidence pertaining to one murder charge was cross-admissible with the

25 evidence pertaining to the second murder charge. *Id.* at 47.  Moreover, Respondents contend the

26 jury was expressly instructed that it should decide Petitioner's guilt pertaining to one charge before

27 deciding his guilty in the other charge. *Id.*

28 //

### a.   State Court Decision

Petitioner raised his claim regarding severance in the petition for review he filed in the California Supreme Court, which the Court summarily denied.  (Lodgment 12.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying this claim as the basis for its analysis.  *Ylst*, 501 U.S. at 803.  The appellate court held the trial court did not err in denying Petitioner's motion to sever the two murder charges.  (Lodgment 11 at 34-44.)[9]  Initially, the court evaluated the law governing joinder and severance of criminal charges.  *Id.* at 36-37.  Citing *People v. Bradford*, 14 Cal. 4th 1229, 1314-1315 (1997), the appellate court noted a defendant seeking severance must make a clear showing in the trial court of the potential prejudice that could result from joining the charges.  The court also noted that a refusal to sever may be an abuse of discretion where:

> (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case."

*Id.* at 1315.  However, the court noted the aforementioned criteria "are not equally significant."  *Id.* "'[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code 1101,[10] in separate trials on the others.'"  *Id.* at 1315-1316.  If evidence on each of the joined charges would have been admissible in separate trials on the charges, any likelihood of prejudice in the denial of a motion to sever is dispelled.  *People v. Maury*, 30 Cal. 4th 342, 393 (2003).

---

[9] The appellate court specifically noted that the trial court held there was "evidence that would be cross-admissible with regard to the 1973 events.  Evidence of intent, evidence of motive, all of those things are cross-admissible."  (Lodgment 7 at 47-48.)  Further, the court of appeal noted that the trial court determined that neither of the charges would be particularly more inflammatory than the other, and although the 1973 case was "qualitatively probably weaker" than the 2004 case, severance was unnecessary.  (Lodgment 11 at 34-35.)

[10] California Evidence Code §1101 states: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

First, the Court of Appeal held the evidence of Somsri's and Phyllis' murders were cross-admissible.  (Lodgment 11 at 37-41.)  The Court based its analysis on *People v. Lenart*, 32 Cal. 4th 1107, 1123 (2004), which states, "Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent."  "To be relevant to prove identity, the uncharged crime must be highly similar to the charged offenses, while a lesser degree of similarity is required to establish relevance to prove common design or plan, and the least similarity is required to establish relevance to prove intent. [Citations.]" *Id.* at 1123.  Additionally, evidence of an uncharged crime is admissible only if it has "substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence." *Id.*

In finding the evidence regarding Phyllis' death was cross-admissible on the issue of *intent* with respect to Somsri's murder, the Court referred to *People v. Ewoldt*, 7 Cal.4th 380, 402 (1994), which states that in order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant "probably harbor[ed] the same intent in each instance."  Specifically, the Court held:

> The circumstances surrounding Phyllis's and Somsri's deaths were similar.  Perhaps most significant is the fact that both victims were married to New at the time they were killed.  In addition, both Phyllis and Somsri were shot a single time, in the back of head, from a relatively close distance.  Both victims appeared to have been asleep at the time they were shot.  At the time each of the victims was killed, New was the beneficiary of the victim's life insurance policy.  These facts are sufficient to support an inference that New did not accidentally shoot Somsri, but instead, that he shot her intending to kill her.  The trial court's conclusion that the probative value of this evidence as to New's intent outweighed its prejudicial effect was reasonable.
>
> The cross-admissibility of the evidence in Phyllis's case on the issue of intent in Somsri's case is itself sufficient to justify the joinder of the two counts, even if the evidence in Somsri's case would not have been cross-admissible for any purpose in Phyllis's case.  (See, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1129 ["it is enough that the assaults were admissible in the murder case; 'two-way' cross-admissibility is not required"]; *People v. Cunningham* (2001) 25 Cal.4th 926, 985 ["complete cross-admissibility is not necessary to justify the joinder of counts"]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1284 [even though the evidence of murder was not admissible at a separate trial for robbery counts, "complete cross-admissibility is not necessary to justify joinder"].)  Nevertheless, we conclude that the trial court did not abuse its discretion in determining that the similarities in these two cases were sufficient to permit evidence regarding Somsri's death to be cross-admissible to establish the identity of Phyllis's killer, despite the high degree of similarity that is required to establish relevance on the issue of identity.

(Lodgment 11 at 39-40.)

//

Nevertheless, the Court of Appeal concluded the trial court did not err in determining the similarities in these two cases were sufficient to permit evidence regarding Somsri's death to be cross-admissible to establish the *identity* of Phyllis' killer.  (Lodgment 11 at 40-41.)  In reaching this conclusion ,the appellate court cited *People v. Britt*, 104 Cal. 4th 500, 505 (2002), which states, "[f]or identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.  The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature."  Although Petitioner argued the circumstances of the two crimes did not present unusual and distinctive characteristics, the appellate court held: "Any one of these similarities, if viewed in isolation, might not be sufficient to support an inference that New was the person who shot both Somsri and Phyllis.  However, when the similarities are viewed in the aggregate, the pattern of similar characteristics is sufficiently unusual and distinctive that a rational inference of identity may be drawn."  (Lodgment 11 at 41.)

Second, the Court of Appeal held the evidence regarding Somsri's murder was not so weak as to require severance.  (Lodgment 11 at 41-42.)  To rebut Petitioner's assertion that the evidence of the 1973 case was so minimal that most likely it could not exist independently of the 2004 case, such that the stronger 2004 charge bolstered the weaker 1973 case, the Court of Appeal held:

> There was a variety of evidence that conflicted with New's story about his having dropped the gun and having accidentally fired it at Somsri.  Although New claimed that when he shot the fatal bullet, Somsri was lying in the same position in which police found her, evidence from the scene suggested otherwise.  There was evidence that Somsri was sitting much higher in the love seat when she was shot than the position she was in when she was found.  There was no bullet hole in the pillow under Somsri's head, yet the bullet should have traveled through the pillow if Somsri had been asleep, in the same position, at the time she was shot.  Other evidence demonstrated that Somsri could not have been shot from six to 12 inches above the floor, as New claimed.  The trial court did not err in determining that the evidence regarding Somsri's murder was not so weak that the two counts had to be severed for trial.

(Lodgment 11 at 42.)

Third, the Court of Appeal held the trial court did not have an obligation to give limiting instructions, *sua sponte*, regarding the jury's consideration of the cross-admissible evidence. (Lodgment 11 at 42-44.)  To reach this conclusion, the Court of Appeal cited *People v. Rogers*, 39 Cal.4th 826, 853-854 (2006), which states, "[i]n the context of limiting instructions concerning evidence of other crimes, we have recognized a narrow exception to the general rule not requiring

1  sua sponte instruction: an objection may not be required in the 'occasional extraordinary case in

2  which unprotested evidence of past offenses is a dominant part of the evidence against the accused,

3  and is both highly prejudicial and minimally relevant to any legitimate purpose.'" Specifically, the

4  Court of Appeal held:

5           Contrary to New's assertion, this case does not present the exceptional situation.
          Evidence regarding each murder was not a "'dominant part of the evidence'" against New as
6          to the other murder.  (*Rogers, supra,* 39 Cal.4th at p. 854.)  In addition, while the evidence
          was prejudicial, it was not unduly so, and the evidence in question was clearly more than
7          "minimally relevant to any legitimate purpose.'"  (*Ib*Id.)  We therefore reject New's
          contention that the trial court had sua sponte duty to instruct the jury with a limiting
8          instruction concerning its use of the cross-admissible evidence.

9  (Lodgment 11 at 43.)

10               b.    *Clearly Established Federal Law*

11       Clearly established federal law provides that Petitioner can establish a violation of his federal

12  due process right to a fair trial if Petitioner carries his "burden of demonstrating that the state court's

13  denial of his severance motion rendered his trial 'fundamentally unfair.'"  *Grisby v. Blodgett,* 130

14  F.3d 365, 370 (9th Cir. 1997), *quoting Hollins v. Department of Corrections, State of Iowa,* 969 F.2d

15  606, 608 (8th Cir. 1992), (citing *Estelle v. McGuire,* 502 U.S. at 68).  The Ninth Circuit summarized

16  the test as follows:

17
          [T]he propriety of a consolidation rests within the sound discretion of the state trial
18        judge.  The simultaneous trial of more than one offense must actually render
          petitioner's state trial fundamentally unfair and hence, violative of due process before
19        relief pursuant to 28 U.S.C. § 2254 would be appropriate.

20  *Bean v. Calderon,* 163 F.3d 1073, 1084 (9th Cir. 1998), quoting *Featherstone v. Estelle,* 948 F.2d

21  1497, 1503 (9th Cir. 1991).  Additionally, even if the trial court's denial of the severance motion

22  violated Petitioner's due process rights, habeas relief would not be available in this Court unless the

23  error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v.*

24  *Abrahamson,* 507 U.S. at 637; *see also California v. Roy,* 519 U.S. 2, 5 (1996); *Early,* 123 S.Ct. at

25  366.

26               c.    *Discussion*

27       The appellate court's opinion here is not "contrary to" clearly established federal law

28  because it neither "applies a rule that contradicts the governing law set forth in [United States

   Supreme Court] cases" nor "confronts a set of facts that are materially indistinguishable from a

1   decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme

2   Court's] precedent." *Williams*, 529 U.S. at 405-06.  The rule applied by the state appellate court in

3   determining whether the trial court abused its discretion in joining the counts is compatible with the

4   "fundamental fairness" inquiry required under federal law.  As set forth above, the state court

5   applied a test which evaluated the prejudice to the defendant in order to determine if the trial court

6   abused its discretion.  The test applied by the state court recognized factors for determining

7   prejudice which included the cross-admissibility of evidence, whether the nature of the charges were

8   unusually likely to inflame the jury, and the presence of any "spillover" effect of evidence from a

9   strong charge to weak one which might effect the outcome.  This test does not "contradict" clearly

10  established federal law as described in *Bean*, because *Bean* recognized the need for consideration of

11  the same factors identified by the state court here.  These factors include cross-admissibility of

12  evidence from one charge to the other, a weaker charge being joined with a stronger one, and

13  whether one charge has a tendency to inflame the passions of the jury, each of which present a high

14  danger of prejudice because it is much more difficult for the jury to compartmentalize such

15  evidence.  *Bean*, 163 F.3d at 1084-86.

16          Neither does the state court's opinion involve an unreasonable determination of the facts in

17  light of the evidence presented in the state court proceedings.  The factual findings by the state court

18  are reasonable.  This Court has reviewed the state court record in determining whether sufficient

19  evidence exists to support the verdict.  In making that review, the Court has determined that the

20  characterization of the evidence and trial testimony by the appellate court, as well as the findings of

21  fact by both the trial and appellate courts, to which this Court gives deference absent clear and

22  convincing evidence to the contrary, are not unreasonable.  Furthermore, the issue here, whether

23  joinder violated due process, is best characterized as a mixed question of law and fact, and the

24  analysis of the claim fits more comfortably in the "unreasonable application of clearly established

25  federal law" prong of § 2254(d)(1).  *See Williams*, 529 U.S. at 404-05 (applying § 2254(d)(1) to

26  state court's ineffective assistance of counsel analysis rather than §§ 2254(e)(1) or (d)(2), implying

27  that AEDPA does not require application of presumption of correctness to a question of law or to an

28  ultimate mixed question of law and fact).

Thus, the Court will consider whether the state court's adjudication of Petitioner's severance claim involved an "unreasonable application" of clearly established federal law. Petitioner claims because the circumstances of the two killings were dissimilar to one another, the evidence as to one charge was not cross-admissible to the other charge. Further, Petitioner contends the joinder of the two murder counts allowed the stronger evidence that he murdered Phyllis to "spill over" to the weaker case that he murdered Somsri, which in turn allowed the jury to believe that if he murdered Phyllis, he must have murdered Somsri.

In *Bean*, the court recognized (1) the lack of cross-admissibility of evidence from one charge to the other and (2) a weaker charge being joined with a stronger one, as factors for determining prejudice. 163 F.3d at 1084-85. Here, the appellate court pointed out the circumstances of Somsri's death were remarkably similar to Phyllis' death. (Lodgment 11 at 39.) In accordance with the reasoning in *Bean*, the court held the similarities in these two cases were sufficient to permit evidence regarding Phyllis' death to be cross-admissible on the issue of *intent* with respect to Somsri's murder, and evidence regarding Somsri's death to be cross-admissible to establish the *identity* of Phyllis's killer. *Id.* at 39-41.

The appellate court's finding that the circumstances of Somsri's death were sufficiently similar to Phyllis' death, thereby making the evidence cross-admissible on the issue of intent in the Somsri murder, and the issue of identity in the Phyllis murder, is objectively reasonable. As the record indicates, a single gunshot was fired into the occipital region of the back of the head of both Somsri and Phyllis, and the bullet entered the women's head and traveled to the front part of their skulls. (Lodgment 16 at 507-508; Lodgment 11 at 41.) In each case, the bullet was fired close to the head of each woman. (Lodgment 15 at 405-407, 430 [Somsri]; Lodgment 16 at 502 [Phyllis]. Both women's lives were insured in which Petitioner was the beneficiary.[11] (Lodgment 13 at 52, 62-63 [Phyllis]; Lodgment 15 at 476 [Somsri]. Each woman was married to Petitioner and Petitioner was the last person to see each alive before their death. Both women were allegedly sleeping when they

---

[11] Respondent contends Petitioner stipulated at trial that he was the primary beneficiary of three life insurance policies insuring Phyllis' life, the total, non-taxable, amount of those insurance benefits was over $800,000, and he filed claims on two of those policies. Further, Petitioner stipulated he claimed and received Phyllis' retirement fund, which was $20,826.09. Petitioner also stipulated he claimed the death benefits relating to an insurance policy on Somsri's life and was paid $15,005.80.

were shot, and both were killed at night.  (Lodgment 13 at 4-5 [Phyllis]; Lodgment 14 at 200 [Somsri].)  Just as the appellate court noted, these facts, viewed in the aggregate, were sufficient to support the inference that Petitioner did not accidentally shoot Somsri, and the inference that the same person murdered both Somsri and Phyllis.  Thus, this is not a case such as *Bean* where the court found the admission of evidence which was not otherwise cross-admissible prejudiced the defendant.  163 F.3d at 1084.  Thus, the simultaneous trial of the two murders did not render Petitioner's trial fundamentally unfair and hence, violative of due process.  *Id.*

Further, the appellate court's conclusion that the evidence regarding Somsri's murder was not so weak as to require severance is objectively reasonable.  As the appellate court noted, evidence from the record conflicted with Petitioner's assertion that he accidentally shot Somsri.  First, prosecution witnesses explained and demonstrated that Petitioner's 1973 description of the bullet being fired did not explain how that bullet traveled upward to strike Somsri's head and then traveled downward to embed itself into the wall behind her.  (Lodgment 15 at 397-398.)  Evidence from the scene also contradicted Petitioner's statement that Somsri's body was in the same position when she was shot as when the police found her.  Testimony from the preliminary hearing indicated Somsri was sitting much higher in the love seat when she was shot than the position she was in when she was found.  (Lodgment 14 at 345-356.)  Also, there was no bullet hole in the pillow under Somsri's head, which disproved Petitioner's claim the bullet struck her while she was sleeping in that position.  *Id.* at 249, 279, 300.  Finally, the prosecution evidence showed the stellate entry head wound sustained by Somsri was caused by a close or contact discharge of the bullet into her head, refuting Petitioner's 1973 statement and demonstration he was six feet away from her when the bullet fired from the rifle.  (Lodgment 15 at 405-407, 430-431.)  Consequently, the state appellate court's decision that the trial court properly denied Petitioner's motion to sever because the evidence regarding Somsri's murder was not so weak as to require severance was not an unreasonable application of clearly established federal law.  *Bean*, 163 F.3d at 1084-85.

Finally, the appellate court's conclusion that the trial court did not have a *sua sponte* duty to give a limiting instruction regarding the jury's consideration of cross-admissible evidence is objectively reasonable.  First, the jury was expressly instructed that it should decide Petitioner's guilt pertaining to one charge before deciding his guilt in the other charge.  Further, other than

complaining about the single alleged instructional error, Petitioner does not challenge the entirety of instructions given to the jury. Therefore, because a single jury instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record," the failure of the trial court to *sua sponte* instruct the jury regarding the consideration of cross-admissible evidence did not "by itself so infect[] the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

Accordingly, the Court finds that the joinder of the two counts did not render Petitioner's trial on the murders fundamentally unfair. The record supports a finding that the jury was capable of compartmentalizing the evidence and not considering it cumulatively and that they were instructed to do so. Accordingly, because Petitioner has failed to carry his burden of demonstrating that the state court's denial of his severance motion rendered his trial fundamentally unfair, the state court's adjudication of his claim was not an unreasonable application of clearly established federal law. *Andrade*, 123 S.Ct. at 1175; *Grisby*, 130 F.3d at 370; *Bean*, 163 F.3d at 1084-86; *Estelle*, 502 U.S. at 68; *Williams*, 529 U.S. at 404-05.

Additionally, even assuming Petitioner could satisfy the conditions of § 2254(d)(1) or (2) by demonstrating that the trial court's denial of the severance motion violated due process, the Court finds that any such error by the state court did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. As discussed above, there is no indication that the jury's ability to compartmentalize the evidence and follow instructions was compromised by the nature of the evidence, and nothing in the record to indicate that the jury was confused or misled in any way. Thus, even were the Court to find that joinder of the charges violated due process, habeas relief is still not appropriate as to this claim. *Brecht*, 507 U.S. at 637; *Roy*, 519 U.S. at 5; *Early*, 123 S.Ct. at 366. Therefore, the Court RECOMMENDS habeas relief as to this claim be **DENIED**.

//

//

//

**V. CONCLUSION**

After thorough review of the record in this case and based on the foregoing, the Court hereby RECOMMENDS the Petition be **DENIED.**

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (1994).  Any party may file written objections with the Court and serve a copy on all parties on or before **January 24, 2011.**  The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be served and filed on or before **February 7, 2011.**  The parties are further advised that failure to file objections within the specified time may waive the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  December 21, 2010

_____
LOUISA S PORTER
United States Magistrate Judge

cc:        The Honorable Janis L. Sammartino
           all parties